FILED

07/28/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0505

DA 25-0505

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 168

DAVID VICEVICH, GILLIAN CLARK,
LEONARD G. JANSON, JR., and LYNN M.
JANSON,

      Plaintiffs and Appellants,

   v.

URBAN R. KULTGEN II and
LUCINDA R. KULTGEN,

      Defendants and Appellees.

APPEAL FROM:   District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow, Cause No. DV-20-403
Honorable Mike Salvagni, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

          Ryan A. Ballard, Vicevich Law, Butte, Montana

      For Appellees:

          Reid Perkins, Worden Thane, P.C., Missoula, Montana

          Submitted on Briefs:  June 10, 2026

                  Decided:  July 28, 2026

Filed:

                _____
                          Clerk

Justice Katherine M. Bidegaray delivered the Opinion of the Court.

¶1 Appellants David Vicevich, Gillian Clark, and Leonard and Lynn Janson (collectively, Vicevich) appeal the June 2025 final order of the Montana Second Judicial District Court, Butte-Silver Bow County, denying their motion for partial summary judgment, granting Appellees Urban and Lucinda Kultgen's (Kultgens) motion for summary judgment, and awarding the Kultgens $106,209 in attorney fees. We address the following restated issues:

1. *Whether the District Court correctly granted summary judgment that an express 60-foot-wide access easement benefits the Kultgens' Lot 4 and was not extinguished by the 2021 Easement Agreement or abandonment.*

2. *Whether the District Court correctly granted summary judgment that the specifically identified section of Vicevich and Clark's fence obstructs the easement and whether the judgment states the removal remedy with sufficient precision.*

3. *Whether the District correctly awarded the Kultgens attorney fees and whether the Kultgens are entitled to attorney fees on appeal.*

We affirm in part, reverse in part, and remand for entry of an amended judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

**The subject properties, plats, and "Kelsey Lane" easement**

¶2 The parties own property in or near the Keck Acres Minor Subdivision in Butte, Montana. Keck Acres was created by subdivision in 1998 and recorded as Plat No. 222-B containing five lots, 1 through 5, as depicted in the image below.[1]

---

[1] The Keck Acres Minor Subdivision was created from Tract 17B of the larger McGuinness Tracts Subdivision.



In July 2003, developer Keck combined Lots 1 and 3 to form Lot 1A/3 and recorded Plat No. 727-B, as depicted in the image below. Plat 727-B depicts "an aggregation of Lots 1 and 3 only," describes the aggregation as "subject to any easement of record," and states that the plat effects "no change to restrictions, conditions, rules or covenants of the original plat of Keck Acres Minor Subdivision."



¶3      Plat 222-B depicts and describes a "60' Wide Unrestricted Private Road Easement for Ingress and Egress," known as "Kelsey Road" or "Kelsey Lane."  The easement runs south from Blacktail Loop along the eastern boundary of Lots 2 and 1A/3, turns southwest toward Lots 5 and 4, and then forms the southern "loop" as it turns south at the northeast corner of Lot 5, runs to the southern boundary of Lots 4 and 1A/3, east to the eastern boundary of Lot 1A/3, and then north to reconnect.  Most of the easement lies within Lots 1A/3 and 2, but portions of it that run along the subdivision's eastern boundary overlap an existing easement on adjacent tracts recorded on separate surveys.[2]  The western leg of the loop relevant to the obstruction claim lies within Lot 1A/3 adjacent to Lots 5 and 4.  Plat 727-B depicts the same "Kelsey Lane" 60-foot easement in the same location

---

[2] Plats 222-B and 727-B also depict Tract 16B (COS 431-A) and Tract 17C (COS 586-A) which both share the eastern boundary of Lots 2 and 1A/3 and the 60-foot easement from Blacktail Loop south to just below where the road splits to form the loop.  As depicted on Plats 222-B and 727-B, the western boundary of Tract 16B and the northwest corner of Tract 17C each contain a portion of the 60-foot-wide Kelsey Lane easement.

as on Plat 222-B. On the ground, only the route from Blacktail Loop to the driveway at the northeastern corner of Lot 5 is paved; the southern loop remains unimproved. The loop is depicted in more detail in the image below.



¶4 Vicevich and Clark own Lot 1A/3 (formerly Lots 1 and 3); Lynn and Leonard Janson (Jansons) own Lot 2; and the Kultgens own Lot 4. Other property owners in and near Keck Acres were parties to the proceedings below but are not parties to this appeal. Delona and Ed Mihelich (Miheliches) own Lot 5 after purchasing it from the Kultgens in 2020. Kimberly and Jason McClafferty (McClaffertys) own land adjacent to Keck Acres, immediately east of the loop, and their driveway enters near the loop's northeast corner. Caroline and Larry Twidwell also own land adjacent to Keck Acres, immediately east of the Jansons' Lot 2 and Vicevich and Clark's Lot 1A/3, though they were not parties to the proceedings below.

¶5 Vicevich and Clark's predecessors in interest, Hiroaki and Yoshimi Hasegawa, purchased Lot 1A/3 from developer Keck in 2006 and sold Lot 1A/3 to Vicevich and Clark in 2018. Vicevich and Clark's deed describes the property as "Lot 1A and 3

5

of the Amended Plat of Keck Acres Minor Subdivision, filed as Plat 727-B, . . . subject to . . . existing easements and rights of way . . . [and] reservations, conditions and restrictions of record."[3]

¶6 The Kultgens purchased the northern Lot 5 from developer Keck in 1998 and later purchased the southern Lot 4 from Keck in 2014. The Kultgens' Lot 5 deed describes the property as "Lot 5 of the Keck Acres Minor Subdivision." The Kultgens' Lot 4 deed describes the property as Lot 4 of "the Keck Acres Minor Subdivision . . . according to the official Plat No. 222-B . . . subject to . . . existing easements and rights of way . . . [and] reservations, conditions and restrictions of record." The Kultgens sold Lot 5 to the Miheliches in December 2020, closing shortly after Vicevich initiated the underlying declaratory judgment action, but kept Lot 4.

**The easement dispute**

¶7 The easement dispute arose sometime in late 2018 when Vicevich and Clark approached the Kultgens about installing a fence along the shared boundary between Lot 1A/3 and Lots 5 and 4. The parties discussed extending the paved road to a cul-de-sac at the Lot 5/Lot 4 boundary in exchange for the Kultgens "extinguishing the loop easement," transferring the land beneath part of the easement, installing a cattle guard or gate "at the easement entrance" near the McClaffertys' driveway, and/or installing a cattle guard or gate that would preserve access to Lot 4. The summary judgment communications

---

[3] Though Vicevich and Clark's Lot 1A/3 deed is not of record in this case, Vicevich admitted in pleadings that the deed contains the above-quoted language.

show that the Kultgens rejected proposals that would eliminate access to Lot 4 and objected to a fence, gate, or cattle guard across the easement.

¶8 By September 2019, Vicevich and Clark finished installing the fence at issue. The M. R. Civ. P. 56 record establishes that the fence crosses the western leg of the loop just below Lot 5's driveway and then runs south along the shared boundary between Lot 1A/3 and Lots 5 and 4 to the southern boundary of Lot 4.[4] The fence completely encloses the western side of the loop and prevents access from that leg of the easement to Lot 4. In October 2020, the Kultgens demanded that Vicevich and Clark remove the fence.

**Easement litigation, the 2021 Easement Agreement, and settlement discussions**

¶9 On December 1, 2020, Vicevich initiated a district court action seeking a declaratory judgment that "the express easement previously established" and "originally platted" through Lot 1A/3, including the "west loop" and "southern leg of the loop," had been extinguished by abandonment. The next day, Vicevich filed a notice of lis pendens against Lot 5.[5]

¶10 When Vicevich filed suit, the Miheliches and the Kultgens were finalizing the purchase/sale of Lot 5, which closed on December 7, 2020. The lawsuit triggered the need for an easement grant to the Miheliches across Vicevich and Clark's Lot 1A/3 to access

---

[4] The record also establishes that, just below Lot 5's driveway where the fence crosses the easement, it traces a small "notch in the fence" Vicevich and Clark left for use as a turn-around at the end of the paved portion of Kelsey Lane.

[5] Vicevich filed a notice of lis pendens against Lot 4 on December 17, 2020. Vicevich later released the Lot 4 and 5 lis pendens on February 2, 2021.

7

Lot 5 for the Miheliches to obtain title insurance. On December 10, 2020, the Miheliches and Vicevich and Clark executed an easement agreement concerning access to Lot 5.

¶11 On December 7, 2020, Vicevich amended the complaint to add the Jansons as plaintiffs. On December 17, 2020, Vicevich amended the complaint to add the McClaffertys as plaintiffs.

¶12 In January 2021, Vicevich, Clark, the Jansons, the McClaffertys, the Twidwells, and the Miheliches—but not the Kultgens—executed a second "Easement Agreement" to define "the location and scope of the existing easement" in Keck Acres.[6] The parties treated the 2021 Easement Agreement as superseding the December 10, 2020 easement agreement.

¶13 The 2021 Easement Agreement purported to "clarif[y]" "right of access to and over [the signatories'] respective properties" and to "supplant[] any existing recorded or platted easements."[7] It described a 30-foot-wide access easement following the paved portion of Kelsey Lane (15 feet on each side of the road's centerline) from Blacktail Loop to Lot 5's driveway; did not describe the southern loop beyond Lot 5; and provided that, because

---

[6] Confusingly, the 2021 Easement Agreement was signed on January 25, 2020. *See* Docs. 16, 58, Ex. C. Throughout proceedings, however, the parties asserted that the agreement was signed on January 25, 2021, "after the buy-sell was entered between Mihelich and Kultgen." *See* Appellants' Opening Brief, pp. 8-9 (citing Doc. 60 (Len Janson affidavit assertion that he and "all of the other subdivision homeowners" executed the Easement Agreement on January 25, 2021)); Docs. 58, 61 (Kim and Jason McClafferty and Lynn Janson affidavits all saying the same); *compare* Docs. 56, 57 (David Vicevich and Gillian Clark affidavits saying they executed the Easement Agreement "with all of the other subdivision homeowners" on February 19, 2021).

[7] It also purported to "run with the title to each [affected] propert[y], whether or not th[e] Agreement [was] referred to in future conveyances of those properties."

8

Lots 5 and 4 were previously held in "common ownership," the sale of Lot 5 to the Miheliches "create[d] an easement by necessity through Lot 5 to Lot 4, for the benefit of" Lot 4's owners. Vicevich recorded the Easement Agreement on February 19, 2021. The day before recording, Vicevich amended the complaint again, adding the Miheliches as plaintiffs.

¶14 During the litigation, the Kultgens, Vicevich, and Clark explored a settlement that included a possible sale of Lot 4. The negotiations did not resolve the case.

**Vicevich's complaint and the Kultgens' counterclaim allegations**

¶15 In the third amended complaint, Vicevich acknowledged that "an express easement was created with the Keck subdivision plat." Vicevich, however, alleged that the "contested portion of the platted easement"—the loop—had been abandoned because: (1) it was "never developed for vehicle traffic" and never used by the Kultgens "for an actual road or access point"; (2) developer Keck installed fencing that the Kultgens never objected to; (3) developer Keck and subsequent owners left "building materials and log and fencepole racks" in the easement; (4) the Kultgens planted trees and permitted continued growth of native trees in the easement and buried family pets there; and (5) the Kultgens placed "large, felled trees lengthwise running North and South along the eastern border of Lot 4 to serve as a fence to prevent off-road traffic."[8]

---

[8] Vicevich also offered an alternative theory—that "post-platting activities extinguish[ed] the easement," e.g., the Kultgens' "unif[ying]" ownership of Lots 4 and 5 when they separately acquired both lots. Though the Special Master and District Court addressed the argument in summary judgment proceedings, Vicevich has abandoned this "merger" theory of extinguishment on appeal and therefore we do not discuss it.

9

¶16    The Kultgens answered the complaint, denying extinguishment. They also filed a counterclaim, asserting that (1) "relative to the area in which" Vicevich and Clark "constructed the fence," there is a 60-foot-wide express easement existing for the benefit of Lot 4, created by deed reference to Plat 222-B; (2) Vicevich and Clark "fenced along the entire front" of Lot 4, "completely blocking" access; and (3) Vicevich and Clark must remove the fence so that it is no longer in the easement or blocking access and not install any new obstructions in the easement without the Kultgens' consent. Vicevich answered, contending that the Kultgens' counterclaims were mooted by the 2021 Easement Agreement which Vicevich claimed extinguished the platted loop easement and created access to Lot 4 through Lot 5.

**Summary judgment motions and Special Master decision**

¶17    The Kultgens moved for summary judgment that they possessed an express 60-foot-wide ingress-and-egress road easement as depicted on the Keck Acres subdivision plats; that Vicevich and Clark's "installation of a fence within the loop area of that express easement" and "other items in that loop area" were "obstructing the easement"; and that "the fence" and "any other obstructions" should be removed. The Kultgens said "the fence runs along the boundary line between Lots 4 and 5 and [the] southern portion of" Lot 1A/3, "partially blocking the easement in some locations" but "entirely blocking access" to Lot 4. In their briefing and affidavit, the Kultgens did not establish any other fencing as obstructing the easement in any other location. The Kultgens also argued that the evidence could not meet the two-part test for abandonment established in *Rieman v. Anderson*,

282 Mont. 139, 935 P.2d 1122 (1997), and that the 2021 Easement Agreement could not alter the Kultgens' rights without their consent.[9]

¶18 Vicevich simultaneously moved for partial summary judgment that the 2021 Easement Agreement "ratified" a 30-foot-wide easement following the paved portion of Kelsey Lane and terminating at Lot 5's driveway. Although Vicevich asserted that the 2021 Easement Agreement ratified the "long-ago" abandonment of the lower loop, Vicevich also maintained that abandonment presented a disputed fact issue for trial.

¶19 The Kultgens responded that the 2021 Easement Agreement could not extinguish their Lot 4 easement because they did not sign it. Vicevich replied to the Kultgens' summary judgment motion principally by referring to the plaintiffs' own motion for partial summary judgment.

¶20 The parties filed numerous affidavits in support of their respective motions for summary judgment. In near-identical affidavits, Vicevich, Clark, the Jansons, and the McClaffertys said that, while they saw the Kultgens regularly use Kelsey Lane to access Lot 5, the Kultgens' former home, they had "never seen them use the portion of the easement road called 'the loop' for vehicular traffic." They claimed that "Lot 4 [had] always been used as a dumping ground and bare ground lot not capable of passenger vehicle traffic traversing it." In a second affidavit, David Vicevich claimed the Kultgens placed "a pile of fence posts" within the loop and, "in discussions with [the Kultgens]

---

[9] The Kultgens also argued that the 2021 Easement Agreement could not extinguish a platted easement that was a condition of subdivision approval without government approval. The Kultgens maintain this argument on appeal. However, summary judgment was not resolved on these grounds, and the issue is therefore not dispositive on appeal.

regarding the aspen trees planted in the easement near the intersection of Lots 4 and 5," the Kultgens were "consistent in objecting to any actions which included cutting down the aspen trees."

¶21 In contrast, the Kultgens claimed they continuously used the loop to access Lot 4 and to walk their dogs, that neighbors regularly walked the loop, and that hired contractors, wood-delivery vehicles, and garbage trucks used the loop for access to Lot 4 and as a turn around. Once, after someone drove onto the Kultgens' property without permission, the Kultgens placed some "small, light" logs "on Lot 4 along the property line" to "temporarily discourage the trespasser" but "removed the logs after approximately one week."

¶22 After full briefing, the District Court appointed a Special Master pursuant to M. R. Civ. P. 53 to address the cross-motions. At an August 2023 status conference, the parties waived oral argument. On October 17, 2023, the Special Master issued a Report and Recommendation concluding that: (1) the Kultgens have an express 60-foot-wide ingress-and-egress road easement as depicted and described in Plats 222-B and 727-B; (2) neither abandonment nor the 2021 Easement Agreement extinguished the easement; and (3) Vicevich and Clark's fence and/or gates interfered with the easement. The Special Master recommended summary judgment for the Kultgens, denial of Vicevich's motion, a declaration of the existence and scope of the easement as described in the plats, removal of easement obstructions, and a declaration that the 2021 Easement Agreement did not affect the Kultgens' rights.

12

**Vicevich's objections, hearing on objections, and District Court decision**

¶23     Vicevich objected to the Special Master's report.  Although Vicevich advanced numerous arguments against the Special Master's conclusions below, the plaintiffs have abandoned many of those arguments on appeal.  Accordingly, we address only the arguments preserved and developed in the appellate briefs.

¶24     Vicevich claimed that the Special Master improperly granted summary judgment after resolving numerous disputed fact questions in the Kultgens' favor.  First, Vicevich said a genuine issue of material fact remained regarding the existence and scope of the easement; specifically, that Plats 222-B and 727-B were ambiguous and conflicted with historical use of the road easement as it existed on the ground.  Second, Vicevich claimed a genuine dispute remained regarding whether the 2021 Easement Agreement or the Kultgens' conduct extinguished the easement.  Third, Vicevich claimed disputed fact questions remained regarding whether Vicevich and Clark's fence was actually within and therefore obstructing the easement.  Finally, Vicevich claimed that enforcing the Special Master's removal order would require "razing" other fences and structures in the easement throughout Keck Acres.

¶25     The Kultgens and the Miheliches responded that Vicevich's objections should be denied and the Special Master's M. R. Civ. P. 56 conclusions adopted in full.[10]  The Kultgens said Vicevich was overstating the effect of the Special Master's removal

---

[10] By this point in proceedings, the Miheliches had asked to be dropped as plaintiffs.  The District Court denied that request but granted David Vicevich's firm's request to withdraw as the Miheliches' counsel.  From then, the Miheliches proceeded pro se.

13

decision—no one was contending that any obstructions beyond the loop portion of the easement needed to be removed, just Vicevich and Clark's fencing "within the loop."

¶26 The District Court set a hearing on Vicevich's objections. A week before the scheduled hearing, Vicevich disclosed that the plaintiffs planned to offer an expert surveyor's opinion testimony. The Kultgens asked the District Court to exclude the expert's testimony because Vicevich disclosed the expert long past the discovery deadline.[11] Vicevich responded with a motion to allow the testimony and additional exhibits, which would establish that the subdivision plats were ambiguous and did not sufficiently describe the easement to support or permit enforcement of the Special Master's decision. The District Court disallowed the expert's testimony or any new evidence not previously presented to the Special Master during summary judgment proceedings. Vicevich does not challenge this ruling on appeal.

¶27 In September 2024, the District Court issued an order denying all Vicevich's objections and adopting the Special Master's recommended disposition on summary judgment, with a final summary judgment order to follow after resolution of attorney fees. The court then ordered briefing on fees and costs.

**The Kultgens are awarded attorney fees**

¶28 The Kultgens claimed entitlement to attorney fees and costs as the prevailing party under applicable covenants and the Uniform Declaratory Judgment Act (UDJA). First, the

---

[11] In their February 2022 response to the Kultgens' discovery request to identity potential experts, Vicevich answered "I have not identified any expert witness yet, will supplement as required by the scheduling order." The scheduling order set a May 6, 2022 deadline for expert disclosures.

14

Kultgens asserted entitlement to fees and costs under a December 1977 recorded "Declaration of Restrictive Covenants" (the Covenants) for COS 4, the larger subdivision containing Tracts 16 and 17, which eventually became the Keck Acres subdivision.[12] Sections 8 and 12 of the Covenants provide that:

> Certain access routes and roads within the real property have been established by easements . . . [and] no fence or other obstruction shall be built on such easements.

> Upon the breach of any of the said covenants and restrictions, anyone owning land in the [described] real property . . . may bring a proper action . . . to enjoin and restrain said violation . . . . In the event of litigation, the prevailing party shall be entitled to reasonable attorney's fees, together with cost of suit expended.

> Failure to enforce any of the restrictions, rights, reservations, limitations, and covenants . . . shall not in any event be construed or held to be a waiver thereof or consent to any further or succeeding breach or violation thereof.

The Kultgens noted that Vicevich had previously admitted the Covenants "cover Plaintiffs' and Defendants' properties, which are in Tracts 16 and 17 of COS 4." The Kultgens also claimed entitlement to fees and costs under UDJA § 27-8-313, MCA.

¶29    Vicevich opposed, arguing that the Kultgens were not entitled to fees under the Covenants, which were "not otherwise followed or honored" because the McGuinness Tracts Roadway and Homeowners' Association (HOA) had been inactive for decades. Vicevich also argued that the Kultgens' alleged bad faith litigation conduct—i.e.,

---

[12] Plat 222-B identifies the Keck Acres subdivision within the larger subdivision Tract 17B.

instigating litigation and stalling settlement negotiations—made any fees award inequitable.[13]

¶30 In December 2024, the District Court concluded that, because the grant of summary judgment to the Kultgens and denial of summary judgment to Vicevich was a judgment resolving all claims for relief in the Kultgens' favor, the Kultgens were the prevailing party. The court further determined that the Kultgens were entitled to attorney fees under the Covenants. Because the Covenants operated to authorize a fees/cost award, UDJA § 27-8-313, MCA, did not apply. The court's order also provided that the plaintiffs, except for the Miheliches, had to pay reasonable attorney fees and ordered the Kultgens to provide an itemized statement of fees.

¶31 The Kultgens' attorney submitted an affidavit and billing records seeking $108,967.50 in attorney fees.[14] Vicevich opposed the fee amount as unreasonable, objecting to "prelitigation" time; "block billing"; "manufacturing" a discovery dispute; work connected to a separate suit involving the Miheliches;[15] and fees incurred after settlement negotiations fell through. Vicevich calculated reasonable fees at $15,109.

---

[13] Vicevich also argued that the Kultgens were not the prevailing party because the District Court's order only required Vicevich and Clark "to remove approximately 100 feet of fencing" so the Kultgens can access Lot 4. Vicevich has abandoned this argument on appeal.

[14] The affidavit claimed $113,555 in fees but the included accounting showed fees totaling $108,967.50, which the District Court later took to be the amount requested.

[15] After purchasing Lot 5 from the Kultgens in December 2020, the Miheliches initiated a separate and unrelated lawsuit concerning that sale which proceeded simultaneous to but ended during this litigation.

¶32 At the April 24, 2025 evidentiary hearing to address fees and costs, the Kultgens presented an attorney expert on the reasonableness of the requested fees under *Plath v. Schonrock*, 2003 MT 21, 314 Mont. 101, 64 P.3d 984. Vicevich initially objected because the expert was not identified earlier but withdrew the objection after the court allowed counsel time to confer with the witness. Vicevich cross-examined the Kultgens' expert. The Kultgens' attorney separately testified about billing records. Vicevich did not cross-examine the Kultgens' attorney or call a witness. Vicevich also did not cross-examine Ed Mihelich, though he testified against Vicevich's claims that the Miheliches should pay a portion of the Kultgens' fees.

**June 2025 final order on summary judgment and attorney fees**

¶33 In June 2025, the District Court entered final summary judgment, granting the Kultgens' motion on express easement and the identified fence obstruction, denying Vicevich's motion for partial summary judgment concerning the 2021 Easement Agreement, denying the requested mediator and Special Master costs, and, after disallowing $2,758.50 for duplicative or unsupported entries, awarding the Kultgens $106,209 in attorney fees. Vicevich appeals.

## STANDARD OF REVIEW

¶34 We review summary judgment de novo and apply the same M. R. Civ. P. 56 criteria as the district court. *Quarter Circle JP Ranch, LLC v. Jerde*, 2018 MT 68, ¶ 7, 391 Mont. 104, 414 P.3d 1277. Summary judgment is proper only when the Rule 56 materials establish no genuine issue of material fact and the movant is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3). Once the movant meets the initial burden, the

17

nonmovant must identify specific admissible facts that create a genuine issue for trial. M. R. Civ. P. 56(e); *Kipfinger v. Great Falls Obstetrical & Gynecological Assocs.*, 2023 MT 44, ¶¶ 13-14, 411 Mont. 269, 525 P.3d 1183.

¶35 Substantive law determines which facts are material. *See Planned Parenthood of Mont. v. State*, 2025 MT 120, ¶¶ 10, 65-66, 70, 422 Mont. 241, 570 P.3d 51; *DeVoe v. State*, 281 Mont. 356, 367-70, 935 P.2d 256, 262-64 (1997); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-56, 106 S. Ct. 2505, 2510-14 (1986). A dispute is genuine only if the properly submitted evidence, viewed with all reasonable inferences in the nonmovant's favor, would permit a reasonable factfinder to find for that party under the burden of proof governing the claim. *See Planned Parenthood*, ¶¶ 65-66, 70 (citing *Anderson*, 477 U.S. at 248-56, 106 S. Ct. at 2510-14); *Smith v. Kerns*, 281 Mont. 114, 116-19, 931 P.2d 717, 718-20 (1997). Pleadings, denial, speculation, and conclusory assertions do not suffice. *Klock v. Town of Cascade*, 284 Mont. 167, 174, 943 P.2d 1262, 1266-67 (1997).

¶36 Whether the Rule 56 materials are sufficient to raise a genuine issue of fact presents a question of law, not fact. *Kipfinger*, ¶¶ 13-14, 36; *J.L. v. Kienenberger*, 257 Mont. 113, 117, 848 P.2d 472, 475 (1993).[16] The summary judgment inquiry does not permit the court to weigh evidence, assess credibility, or choose between competing reasonable inferences. *Harland v. Anderson*, 169 Mont. 447, 450, 548 P.2d 613, 615 (1976) (the district court

---

[16] *Overruled in part on other grounds by Crisafulli v. Bass*, 2001 MT 316, 308 Mont. 40, 38 P.3d 842.

"does not function to adjudicate genuine issues of fact" on a summary judgment motion—"it merely determines whether such issues exist").[17] The court asks whether the nonmovant's evidence, viewed as Rule 56 requires, could reasonably support a finding in the nonmovant's favor and therefore create a genuine issue for trial. When the evidence permits only one reasonable conclusion, the court may resolve the issue as a matter of law. *Lorang v. Fortis*, 2008 MT 252, ¶ 136, 345 Mont. 12, 192 P.3d 186; *Seeley v. Davis*, 284 Mont. 517, 523, 946 P.2d 119, 122 (1997).

¶37 Whether a party is entitled to recover attorney fees is a question of law reviewed de novo for correctness. *Apecella v. Overman*, 2025 MT 219, ¶ 28, 424 Mont. 202, 577 P.3d 133. Where legal authority exists to award attorney fees, we review the attorney fee award for an abuse of discretion. *Chase v. Bearpaw Ranch Ass'n*, 2006 MT 67, ¶¶ 14-15, 331 Mont. 421, 133 P.3d 190; *Ray v. Nansel*, 2002 MT 191, ¶¶ 40-47, 311 Mont. 135, 53 P.3d 870.

## DISCUSSION

¶38 Though Vicevich raised numerous objections to the Special Master's report and recommendations on summary judgment below, and the District Court resolved each objection, Vicevich has abandoned some of those arguments on appeal. We address only those claims of error that Vicevich expressly asserts on appeal.

¶39 Before we address the merits, we clarify the record under review. On summary judgment, we consider only materials properly before the District Court when it ruled on

---

[17] *Overruled in part on other grounds by Warnack v. Coneen Family Trust*, 266 Mont. 203, 879 P.2d 715 (1994).

the merits. On appeal, both sides cite some materials filed after the District Court's initial September 2024 summary judgment ruling. We do not consider those later affidavits or exhibits to determine the existence, scope, extinguishment, or obstruction of the easement. M. R. Civ. P. 56(c)(3); *accord DeVoe*, 281 Mont. at 367-68, 935 P.2d at 263; *Anderson v. Stokes* (*Stokes*), 2007 MT 166, ¶¶ 56-58, 338 Mont. 118, 163 P.3d 1273.

¶40    Further, we will not hold a lower tribunal in error for an issue it did not have an opportunity to consider. *Pearson v. Virginia City Ranches Ass'n*, 2000 MT 12, ¶¶ 57-58, 298 Mont. 52, 993 P.2d 688. Accordingly, we review summary judgment on the Rule 56 record that existed when the District Court ruled. We therefore do not use later fee-stage affidavits or exhibits to determine whether a genuine issue precluded the merits ruling.

¶41    *1. Whether the District Court correctly granted summary judgment that an express 60-foot-wide access easement benefits the Kultgens' Lot 4 and was not extinguished by the 2021 Easement Agreement or abandonment.*

¶42    Vicevich argues that genuine issues of material fact remain concerning both the easement's existence and its extinguishment. We address each contention in turn.

**1. The Kultgens have an express 60-foot-wide ingress-and-egress road easement**

¶43    Relying principally on Plat 222-B and the recorded deed for Lot 4, the Special Master concluded that the Kultgens hold an express 60-foot-wide ingress-and-egress road easement to access their Lot 4 property. Plat 727-B independently confirms that the 2003 aggregation preserved easements of record. No genuine issue of material fact precluded summary judgment on the creation or recorded scope of the easement.

¶44    An easement is a right which one person has to use the land of another for a specific purpose or a servitude imposed as a burden upon the land. *Blazer v. Wall*, 2008 MT 145,

20

¶ 24, 343 Mont. 173, 183 P.3d 84.  As pertinent here, "an express easement is one which is created by an instrument in writing."  *Sieben Ranch Co. v. Adams*, 2021 MT 172, ¶ 14, 404 Mont. 510, 494 P.3d 307; *Davis v. Hall*, 2012 MT 125, ¶¶ 18-19, 365 Mont. 216, 280 P.3d 261.  An express easement may arise when a written instrument of conveyance refers to a recorded plat or certificate of survey on which the easement is depicted and described.  *Pearson*, ¶¶ 21, 26-27; *Davis*, ¶ 19; *Blazer*, ¶ 27; *O'Keefe v. Mustang Ranches HOA*, 2019 MT 179, ¶ 18, 396 Mont 454, 446 P.3d 509; *Halverson v. Turner*, 268 Mont. 168, 172-73, 885 P.2d 1285, 1288-89 (1994) ("reference in documents of conveyance to a plat which describes an easement establishes the easement" (citing § 76-3-304, MCA)).[18] The principle behind the easement-by-reference doctrine is inducement—selling lots with reference to a plat describing property and appurtenances "creates an implied covenant" that the property "shall be used in the manner designated."  *Our Lady of the Rockies, Inc. v. Peterson*, 2008 MT 110, ¶¶ 45-50, 55-57, 342 Mont. 393, 181 P.3d 631 (discussing easement-by-reference cases); *accord Pearson*, ¶ 19.

¶45      In *Pearson*, the plaintiffs obtained a declaratory judgment that they had an express bridle path easement as created by their deed, which referred to a recorded subdivision plat depicting the easement.  *Pearson*, ¶¶ 10-13.  The defendants argued that the court erroneously resolved the issue on the deed and plat alone, ignoring extrinsic evidence that

---

[18] "Where lands are conveyed by reference to a plat, the plat itself or any copy of the plat properly certified by the county clerk and recorder as being a true copy thereof shall be regarded as incorporated into the instrument of conveyance and shall be received in evidence in all courts of this state."  Section 76-3-304, MCA.

the bridle path was never developed and that other subdivision lot owners had taken formal action to remove all references to the bridle path easement from the recorded plats. *Pearson*, ¶¶ 12, 16, 22. We affirmed on appeal that the deed's reference to the subdivision plat which, in turn, "clearly depict[ed] and label[ed] the bridle path easement," created an express easement. *Pearson*, ¶¶ 17-21. We further held that the court was not required to consider extrinsic evidence of contrary intent when the deed and plat established a clear intent to create the bridle path easement in the first instance. *Pearson*, ¶¶ 17-27.

¶46    Here, like in *Pearson*, the Kultgens' Lot 4 deed describes the property by reference to "Plat No. 222-B . . . subject to . . . existing easements and rights of way . . . [and] reservations, conditions and restrictions of record." Plat 222-B, in turn, clearly depicts and labels the "60' Wide Unrestricted Private Road Easement for Ingress and Egress," known as "Kelsey Road" or "Kelsey Lane," including the loop. The western leg relevant to the obstruction claim lies within Vicevich and Clark's Lot 1A/3, adjacent to Lots 5 and 4, making their property the servient estate.[19] The deed and incorporated plat therefore created the express easement as a matter of law. Plat 727-B did not extinguish or narrow that right; it states that the 2003 filing aggregated Lots 1 and 3 only, remained subject to easements of record, and made no change to the original plat's restrictions, conditions, or covenants.

---

[19] Vicevich and Clark's deed references Plat 727-B, which also clearly depicts and labels the 60-foot-wide "Kelsey Lane" easement and refers to "the original plat of Keck Acres Minor Subdivision," Plat 222-B.

22

¶47 Notwithstanding, Vicevich contends the Special Master could not resolve creation of the easement on the plats alone because they were facially ambiguous and contradicted the historical use and actual location of the paved portion of Kelsey Lane. Vicevich argues plat ambiguity created a genuine issue of material fact requiring jury resolution. We disagree.

¶48 Vicevich claims the plaintiffs' expert surveyor would have established the plats' ambiguity. Vicevich disclosed the expert a week before the scheduled hearing on objections and after the Special Master heard and recommended disposition of the parties' cross-motions. The District Court disallowed the expert's testimony because the Special Master never had a chance to consider it. Vicevich does not contend that this was error. Still, by citation to a disallowed affidavit, Vicevich recites the surveyor's opinion that Plats 222-B and 727-B contain errors and discrepancies rendering them ambiguous and necessitating extrinsic evidence of actual and historical use for correct interpretation. The District Court declined to consider the surveyor's opinion, limiting its review to matters and arguments within the record when deciding whether to adopt the Special Master's conclusions on summary judgment. Vicevich cannot now use disallowed evidence proffered after the Special Master's decision and not considered by the District Court to create an issue of fact precluding summary judgment. *See Stokes*, ¶¶ 56-58.

¶49 In any event, Vicevich's claim that Plats 222-B and 727-B are ambiguous because the easement is "depicted differently" on each plat is of no avail. The only difference between the plats Vicevich identifies is that Plat 222-B refers to the easement as "Kelsey Road" while Plat 727-B refers to it as "Kelsey Lane" and does not expressly identify it "as

23

an easement." Vicevich identifies only a terminology difference between the plats that does not create ambiguity. Plat 222-B, which the Lot 4 deed expressly incorporates, supplies the grant's width, route, and ingress-and-egress purpose. Plat 727-B expressly preserves "any easement of record," and makes "no change to restrictions, conditions, rules or covenants of the original plat of Keck Acres Minor Subdivision," Plat 222-B. Whether Plat 727-B calls the route "Kelsey Lane" rather than "Kelsey Road" cannot affect the existence or scope of the Lot 4 easement. *See Pearson*, ¶¶ 21-27 (when a deed clearly and unambiguously refers to a plat depicting and labeling the easement, "such language needs no interpretation"); *Bridger v. Lake*, 271 Mont. 186, 191, 896 P.2d 406, 408-09 (1995) ("the breadth and scope of an easement are determined upon the actual terms of the grant" (citing § 70-17-106, MCA)).

¶50 Vicevich's claim that the plats are ambiguous because they contradict the historical use and actual location of the paved portion of Kelsey Lane likewise fails. Essentially, Vicevich argues that the paved road does not align perfectly with the plats and that because the loop is unpaved, it is no longer meant for road access. As stated above, Plat 222-B supplies the width, route, and ingress-and-egress purpose of the road easement, and Plat 727-B preserves the recorded right. Evidence of Kelsey Lane as it exists on the ground cannot defeat the unambiguous creation of a 60-foot-wide ingress-and-egress road easement as conveyed and platted—extrinsic evidence resolves ambiguity; it does not create it. *See Brandt v. R.R. Mt. Escapes, LLC*, 2025 MT 155, ¶ 16, 423 Mont. 100, 572 P.3d 809; *accord Pearson*, ¶¶ 17-27. Vicevich's alleged ambiguities did not create a genuine issue of material fact for trial.

24

¶51   Finally, despite Vicevich's later assertions that the plats were ambiguous, the plaintiffs admitted numerous times throughout proceedings that the Keck Acres subdivision plats depicted and described an ingress-and-egress road easement benefiting all lot owners—in Vicevich's own words, "the parties all agree[d] that an easement exists." In pleadings, Vicevich acknowledged that "an express easement was created with the Keck subdivision plat" and that it was a "platted easement road." Vicevich admitted that Plat 727-B "showed an intended easement at 60 feet wide" and "intended to create an easement at 60 feet wide." In correspondence with the Kultgens, Vicevich and Clark referred to the "60' easements" and "ingress and egress road" and recognized that the Kultgens had rights to the "ingress and egress easement." While they do not independently establish the precise location of the easement on the ground, these admissions reinforce the conclusion compelled by the Lot 4 deed and Plat 222-B. They also tend to show that the existence and scope of the easement was not genuinely disputed below.

¶52   We hold that the Lot 4 deed and Plat 222-B created an express 60-foot-wide ingress-and-egress easement and that Plat 727-B preserved it. The District Court correctly entered summary judgment on the existence and recorded scope of the easement.

**2. The Kultgens' express easement was not extinguished**

¶53   From the outset of this litigation, Vicevich has proceeded on the theory that the loop portion of the easement was extinguished either by the 2021 Easement Agreement or the Kultgens' intentional abandonment. Neither of these theories succeeds.

25

## A. The 2021 Easement Agreement did not extinguish the easement

¶54    The 2021 Easement Agreement, which the Kultgens did not sign, purported to "supplant[] any existing recorded or platted easements" with a 30-foot route ending at Lot 5 and an asserted access route across Lot 5 to Lot 4. Vicevich argues that the signatories to the 2021 Easement Agreement thereby extinguished the loop.

¶55    A similar extinguishment theory failed in *Pearson*. In addition to claiming that the lower court erroneously determined the existence and scope of the bridle path easement without considering extrinsic evidence, *supra*, the defendants in *Pearson* also claimed that their majority resolution to "remove all references to the bridle path easement from all plats of record" for the subdivision effectively extinguished the easement. *Pearson*, ¶¶ 1, 11-12. We disagreed. The defendants, based on authority purportedly arising under an assignment and deed from the subdivision owner, took and then recorded majority action to abandon the bridle path easement. But not only did the defendants not own title to the easement, they also "could not effectively terminate the easement without the consent and/or release of all lot owners who own[ed] the lots to which the easement [was] appurtenant." *Pearson*, ¶ 33. We affirmed that the defendants' attempted extinguishment was invalid. *Pearson*, ¶¶ 31-37.

¶56    Here, the signatories could define or create rights among themselves, but they could not modify, replace, relocate, or extinguish the Kultgens' existing Lot 4 easement without the Kultgens' consent. *Pearson*, ¶¶ 31-37. The 2021 Easement Agreement was not a conveyance by the Kultgens and could not transfer their property right to a different servient estate. Despite Vicevich's assertions, the reasons the Kultgens did not sign are

26

immaterial. The legal effect of the 2021 Easement Agreement on the Kultgens' easement presents a question of law, and the District Court correctly held that it did not affect or replace that easement. We express no opinion on the validity or effect of the 2021 Easement Agreement among its signatories.

## B. The easement was not extinguished by abandonment

¶57 Vicevich also contends that the Rule 56 record created a genuine issue whether the Kultgens abandoned the loop. We disagree. Crediting Vicevich's properly submitted evidence and drawing every reasonable inference in Vicevich's favor, the evidence still could not permit a reasonable factfinder to find abandonment of the easement by clear and convincing evidence.

¶58 A perfected easement may be extinguished by abandonment. *Apecella*, ¶ 34. Abandonment has two elements: the easement holder's non-use and affirmative action "of a character so decisive and conclusive as to indicate a clear intent to abandon the easement." *Apecella*, ¶ 34 (citing *Renner v. Nemitz*, 2001 MT 202, ¶ 13, 306 Mont. 292, 33 P.3d 255). The easement holder's action must evidence relinquishment of possession and an intent not to resume beneficial use. *Cook v. Hartman*, 2003 MT 251, ¶ 34, 317 Mont. 343, 77 P.3d 231. Non-use, without more, is insufficient to prove extinguishment by abandonment—both elements must be satisfied. *Apecella*, ¶ 41; *Renner*, ¶ 30; *Shammel v. Vogl*, 144 Mont. 354, 361-62, 396 P.2d 103, 107-08 (1964); *accord City of Billings v. O. E. Lee Co.*, 168 Mont. 264, 268, 542 P.2d 97, 99 (1975) ("an easement acquired by grant or reservation cannot be lost by mere nonuser for any length of time, no matter how great"); *Pearson*, ¶¶ 47, 49 ("the owner of the dominant tenement is not

27

required to make use of the easement as a condition to retaining his interest in the easement" for "implicit within an express easement by reservation is the idea that the easement is reserved until such time the easement's use is requested" (citing *Halverson*, 268 Mont. at 175, 885 P.2d at 1290)).

¶59 The party claiming abandonment bears the burden to prove it by clear and convincing evidence. *Apecella*, ¶¶ 34-36; *Renner*, ¶ 13. Clear and convincing evidence requires "that a preponderance of the evidence be definite, clear, and convincing." *Wareing v. Schreckendgust*, 280 Mont. 196, 206, 930 P.2d 37, 43 (1996) (citation omitted). That heightened burden protects established property rights and informs whether the Rule 56 dispute is genuine. *See Renner*, ¶ 13; *Planned Parenthood*, ¶¶ 65-72; *Anderson*, 477 U.S. at 254-56, 106 S. Ct. at 2513-14.

¶60 Because Vicevich asserted extinguishment, the plaintiffs bore the affirmative burden to identify and present admissible evidence sufficient to support the theory invoked. To defeat summary judgment on abandonment, the evidence, viewed in Vicevich's favor, had to permit a reasonable factfinder to find by clear and convincing evidence both nonuse and decisive conduct manifesting a clear intent to relinquish the easement permanently. Even drawing all inferences in Vicevich's favor, the Rule 56 record evidence was not sufficient to permit the abandonment issue "reasonably [to] be resolved in favor of either party." *See Anderson*, 477 U.S. at 248-50, 106 S. Ct. at 2510-11; *Smith*, 281 Mont. at 116-19, 931 P.2d at 718-20. Instead, only one reasonable conclusion could be had: the evidence did not satisfy the quantum required to prove abandonment, so the

28

extinguishment claim must fail and resolution by summary judgment was proper. *See Lorang*, ¶ 136; *Seeley*, 284 Mont. at 523, 946 P.2d at 122.

¶61 Here, in support of the plaintiffs' claim for abandonment, Vicevich submitted near-identical affidavits from David Vicevich, Gillian Clark, Kim and Jason McClafferty, and Lynn and Leonard Janson wherein each alleged only that (1) the loop easement was "long-ago abandoned"; (2) they had "never seen [the Kultgens] use the portion of the easement road called 'the loop' for vehicular traffic"; and (3) "Lot 4 [had] always been used as a dumping ground and bare ground lot not capable of passenger vehicle traffic traversing it." In a separate, second affidavit, David Vicevich alleged that (4) the Kultgens placed "a pile of fence posts" within the loop portion of the easement and (5) "in discussions with [the Kultgens] regarding the aspen trees planted in the easement near the intersection of Lots 4 and 5," the Kultgens were "consistent in objecting to any actions which included cutting down the aspen trees."

¶62 In contrast, the Kultgens asserted that they and others used the lower loop to reach Lot 4. They submitted communications, which Vicevich did not dispute, showing that Vicevich and Clark proposed a cul-de-sac or land transfer while the Kultgens insisted on preserving Lot 4 access. The Kultgens acknowledged that they placed "some logs on Lot 4 along the property line" for "approximately one week" to deter a trespasser and that aspen suckers within the route could be removed if the road was developed.

¶63 That evidence, even if credited, could not permit a reasonable factfinder to find abandonment by clear and convincing evidence. First, Vicevich's assertion that the loop easement was "long-ago abandoned" was conclusory and could not raise an issue of fact.

M. R. Civ. P. 56(e)(2); *Kipfinger*, ¶ 14; *Klock*, 284 Mont. at 174, 943 P.2d at 1266-67. Second, statements that affiants had not seen vehicular use established nonuse at most, and mere nonuse of an express easement alone does not extinguish it. *Apecella*, ¶ 41, *Renner*, ¶ 30; *Pearson*, ¶¶ 47, 49. Third, there being removable fence posts, aspen growth, and temporary logs on Lot 4 likewise did not constitute conduct so decisive and conclusive as to manifest a clear intent to relinquish the easement permanently. *Apecella*, ¶ 34; *Renner*, ¶¶ 13, 30; *Pearson*, ¶¶ 47, 49. On the Rule 56 record, the District Court correctly decided that the Kultgens did not abandon their express easement as a matter of law.

¶64 Vicevich also relies on additional allegations that the following, either placed in or not removed from the easement, reflected the Kultgens' abandonment of the easement: cottonwood trees, car parts, garbage, building materials, bricks, retaining-wall blocks, utility boxes and poles, other fencing, and fence-post racks. But the cited-to materials do not create a triable issue. To support some of these assertions, Vicevich cites to documents filed after the District Court's merits ruling. The timely materials either do not place the asserted condition within the easement, do not attribute it to the Kultgens or show their assent, or do not establish an act incompatible with future exercise of the easement.[20]

---

[20] For example, to support the assertion that "large cottonwood trees were placed across the entire 60 feet of the easement serving to block it," Vicevich cites Doc. 22, the Kultgens' answer to the plaintiffs' third amended complaint and counterclaim, which says no such thing. To support the assertion that "car parts, garbage, and building materials were placed within it to obstruct the easement," Vicevich cites Doc. 60, Len Janson's affidavit in support of summary judgment, which says only that "Lot 4 has always been used as a dumping ground lot not capable of passenger vehicle traffic traversing it" and does not mention "car parts, garbage, [or] building materials," and Doc. 113, which is the plaintiffs' motion opposing attorney fees, filed after the District Court's decision on summary judgment. Doc. 113 contains two photos and a citation to Doc. 118, David Vicevich's affidavit in support, where Vicevich alleges that "the Kultgens have piles of debris and rubbish on their property." The photos, also included as Exhibit K to Vicevich's affidavit, depict

Those assertions therefore cannot support abandonment or create a genuine issue of material fact.

¶65 Vicevich also relies on communications concerning possible development to the south of Keck Acres and a proposed cul-de-sac. The timely communications show that the Kultgens initially expressed interest in the cul-de-sac option but insisted that any proposal be developed to reach Lot 4 so they could access their property. Considering and rejecting an alternative route does not manifest a decisive and conclusive intent to abandon the existing easement permanently. *Apecella*, ¶ 34; *Renner*, ¶ 13.

¶66 Vicevich contends that under *Rieman*, the Rule 56 record was sufficient to support an inference that the Kultgens intentionally abandoned their easement. But *Rieman* is distinguishable. There, we held the easement holder had abandoned his ditch easement by plugging the ditch at the point of diversion, plowing in the ditch to install a road, removing several culverts so that no water could flow onto his property, ceasing maintaining the ditches, and expressly telling neighbors he no longer intended to irrigate his property. *Rieman*, 282 Mont. at 143, 935 P.2d at 1124. Those acts destroyed the ditch's function and were accompanied by an express renunciation of future use. Here, the timely evidence showed removable materials, natural vegetation, temporary logs, and an undeveloped lot but no comparable destruction of the function of the easement or express relinquishment.

---

some logs, rounds, and "car parts at [the] east entrance of Lot 4." Finally, to support the assertion that "a southern neighbor's fence, construction materials, bricks, retaining wall blocks, utility boxes and poles, other fencing, and racks for holding fence poles were never removed," Vicevich cites Doc. 68, David Vicevich's affidavit in support of summary judgment, which mentioned only "a pile of fence posts" and cutting back aspens, and post-summary-judgment Doc. 118, David Vicevich's affidavit, *supra*.

31

¶67 Vicevich also argues on appeal that the Rule 56 record established abandonment under § 70-17-111(1)(c), MCA (extinguishing servitudes). But Vicevich did not argue this extinguishment theory below. Instead, the Kultgens raised § 70-17-111, MCA, in response to Vicevich's common-law abandonment theory, arguing Vicevich could not prove abandonment under either common *or* statutory law. Vicevich did not address or argue the statutory issue, leaving it undisputed. Our de novo review of the record reveals that § 70-17-111(1)(c), MCA, does not alter the result. This statute requires an act by the easement owner, or an act undertaken with the owner's assent, that is incompatible with the nature or exercise of the easement. Section 70-17-111(1)(c), MCA. The timely evidence did not show that the Kultgens performed or assented to an act incompatible with future exercise of the easement.[21] And, contrary to Vicevich's assertions on appeal, the 2021 Easement Agreement cannot supply the required assent because the Kultgens did not sign it.

¶68 The properly submitted evidence could not permit a reasonable factfinder to find an act by the Kultgens, or an act with their assent, incompatible with the easement under § 70-17-111(1)(c), MCA, or support common-law abandonment by clear and convincing evidence. The District Court did not need to assess credibility or weigh competing

---

[21] Vicevich contends that § 70-17-111(1)(c), MCA, was satisfied because "the Kultgens took action to block the loop portion [of the] easement." As discussed above, the timely Rule 56 evidence showed only removable logs, stored posts, aspen suckers or vegetation, and an undeveloped lot. Vicevich did not show that these conditions permanently blocked the easement or that the Kultgens assented to a permanent barrier. *See* § 70-17-111(1)(c), MCA (a servitude may be extinguished "by the performance of any act upon either tenement by the owner of the servitude or with the owner's assent that is incompatible with its nature or exercise").

evidence; even when credited, Vicevich's evidence was legally insufficient under the governing burdens of proof to raise a genuine issue of material fact on the issue of abandonment.

¶69    *2. Whether the District Court correctly granted summary judgment that the specifically identified section of Vicevich and Clark's fence obstructs the easement and whether the judgment states the removal remedy with sufficient precision.*

¶70    Vicevich argues that the record does not identify which fence lies within the easement or whether any fence unreasonably interferes with reasonable use.  Vicevich says "there are several fences located within the easement" and it remains "[un]determined which fences, if any, constitute an obstruction."  Vicevich also challenges the Special Master's reference to the platted "no build zone."

¶71    We affirm summary judgment as to the specifically identified western fence:  the section crossing the loop below Lot 5's driveway and running south along the boundary between Lot 1A/3 and Lots 5 and 4.  On the Rule 56 pleadings, arguments, and evidence, this is the only fence that the Kultgens established as obstructing the easement and therefore is the only fence actually encompassed in the District Court's summary judgment.  Because the District Court's final summary judgment order is unclear on this point, we reverse the provision requiring removal of "any obstructions" placed within the easement less than five years before the action because the Rule 56 record did not identify or establish any other obstruction with sufficient specificity.  We remand for entry of an amended judgment that precisely identifies the affected fence and requires its removal so that it no longer blocks access to Lot 4.

33

**Summary judgment decision on the Kultgens' fencing obstruction claim**

¶72 The Kultgens asked for summary judgment that:

they "possess an express 60-foot-wide road easement as depicted" in Plats 222-B and 727-B.

Vicevich and Clark's "installation of a fence" and "placing other items" within "the loop area of that express easement . . . is obstructing the easement."

Vicevich and Clark must "remove the fence obstruction" and "any other obstructions they have placed within *the loop* easement area as well as the no-build areas depicted on" Plats 222-B and 727-B at their own cost.

"No new obstructions or gates can be installed in the future in the easement" without the Kultgens' or their successors' "prior agreement."

¶73 While the Kultgens' summary judgment motion generally tracked the relief requested in their counterclaim, it did not completely mirror it. Though the Kultgens initially asked for declaratory judgment that "any obstructions placed within the easement that have not existed for five continuous years or longer" be removed, they did not carry that request forward in their motion for summary judgment and did not offer proof as to which other obstructions, if any, had existed for less than five years. And, for the first time, the Kultgens also asked that Vicevich and Clark be ordered to remove any obstructions "within . . . the no-build areas" depicted on both plats. Plats 222-B and 727-B depict a "No Build Restriction" area (described as a "no build zone; no structure or building is permitted") larger than the easement; it encompasses all of the 60-foot-wide easement on the western side of the loop and extends into Lot 1A/3 for a distance about equivalent to the width of the easement. See Plats 222-B and 727-B, illustrated above.

34

¶74 The Special Master concluded that Vicevich and Clark's "fence is located within the road easement, including in the area marked 'No Build Restriction' on the plat," and "blocks access to the unimproved portion of the road easement 'loop' reaching Lot 4." He recommended ordering removal of "all gates, fencing, or other barriers interfering with the easement." The Special Master did not mention or specify a five-year time restriction on any identified obstructions.

¶75 At the July 2024 hearing on Vicevich's objections to the Special Master's decision, the District Court asked the Kultgens twice to specifically identify the section of fence they were asking to be removed. They described it as the fence running across the loop easement below Lot 5's driveway and "along the property line" between Lots 5, 4, and 1A/3 and "blocking Lot 4." The Kultgens confirmed for the District Court the location of the fence on the plats along the western boundary of the loop easement. The Kultgens did not mention or discuss any other fencing or structures as obstructing the easement or that they wanted the court to order removed. After hearing, the District Court denied Vicevich's objection and affirmed the Special Master's "determination about the fence" as correct.

¶76 Later, after deciding the attorney fees issue, the District Court issued a final order on summary judgment, concluding, as pertinent, that:

> Vicevich and Clark "are obstructing the easement with *a fence*" and "shall remove and/or relocate *the fence* so that it is not located within the easement and no longer blocking [the Kultgens'] access to the easement."
>
> "Plaintiffs shall remove *any obstructions* placed within the easement that have not existed for five continuous years or longer prior to the initiation of

35

the action" and "shall not build any fence or other obstruction" in the easement without the Kultgens' consent.

(Emphasis added.)

**The Kultgens' Rule 56 proof on their obstruction claim**

¶77 Plat 222-B places the western leg of the loop within Lot 1A/3 along the boundary adjoining Lots 5 and 4. Vicevich and Clark admitted that their fence runs along that boundary and that they placed it approximately one inch inside Lot 1A/3. The Rule 56 photographs and affidavits show the fence crossing the western leg below Lot 5's driveway and continuing along Lot 4's entire frontage. Because the recorded plat and Vicevich and Clark's own admissions locate this specific fence within the easement, the absence of an encroachment survey did not create a genuine issue as to this fence.

¶78 A servient owner may use land burdened by an easement so long as the use does not unreasonably interfere with the dominant owner's rights or make exercise of the easement more inconvenient, costly, or hazardous. *Musselshell Ranch Co. v. Seidel-Joukova*, 2011 MT 217, ¶¶ 15, 20, 362 Mont. 1, 261 P.3d 570. Vicevich and Clark's fence leaves no opening from the western leg of the easement to Lot 4. In *O'Keefe*, we held that servient owners may not unreasonably interfere with the easement rights of other benefited owners. *O'Keefe*, ¶ 34. Here, the undisputed complete blockage of access to Lot 4 constituted unreasonable interference as a matter of law. Section 8 of the Covenants independently prohibits a fence or other obstruction on a road easement. The District Court therefore correctly entered summary judgment that this section of fence obstructs the easement.

36

¶79　The Rule 56 record did not establish or identify the precise location, age, or obstructive effect of any other fence or structure in the easement.[22]　The Kultgens asked for summary judgment only that Vicevich and Clark "remove the fence obstruction" and "any other obstructions they have placed within *the loop* easement area as well as the no-build areas."　Besides the fence crossing the western leg of the easement below Lot 5's driveway and running along the shared boundary between Lots 5, 4, and 1A/3, the Kultgens did not establish what, if any, "other obstructions" existed within the loop or establish the length of time they had been there.　Therefore, the District Court's generic command to remove "any obstructions placed within the easement that have not existed for five continuous years or longer" prior to the action exceeded the scope of the Rule 56 record and requested relief and is hereby reversed.　On remand, the court must order removal of and identify with precision the only fencing obstruction actually litigated.

¶80　Vicevich's concern about the Special Master's reference to the platted "no build zone" is not entirely unfounded.　The no-build restriction does not expand the pleaded obstruction claim.　To the extent the Special Master relied on that restriction, the requested relief exceeded the Kultgens' claim for removal of an obstruction from the easement as pleaded.　The District Court did not, however, specifically require Vicevich and Clark to remove fencing or obstructions in the no-build zone, so it is essentially a

---

[22] For example, the Kultgens assert on appeal that "the fence across other boundary lines also necessarily obstructs access," including a section that "completely blocks access to the easement that extends south from the junction to [southern landowner] Harrington's fence," and "this is why 'all' Vicevich/Clark fencing needs to be removed."　The Rule 56 record does not support this assertion.

non-issue and, contrary to Vicevich's assertions, it cannot create an issue of fact precluding summary judgment. On remand, the court's amended judgment should not order relief based solely on the no-build area.

¶81 We therefore affirm summary judgment that the specifically identified western fence unreasonably obstructs the easement, reverse the generic provision concerning unidentified obstructions, and remand for an amended judgment. The amended judgment shall, in place of the generic "the fence" and "a fence," specifically identify the affected fence as Vicevich and Clark's fence running across the western leg of the loop below Lot 5's driveway and south along the entire shared boundary of Lots 5, 4, and 1A/3. The court may also describe the affected fence by reference to the Lot 4 deed that refers to the recorded plat, or another sufficiently precise description. The amended judgment shall also strike the language requiring removal of "any obstructions placed within the easement that have not existed for five continuous years or longer prior to the initiation of the action" and shall require Vicevich and Clark to remove the fencing specifically identified above so that it no longer blocks access to the western leg of the easement or Lot 4. In its amended judgment, the District Court shall clarify that no other existing fence, structure, or alleged obstruction has been adjudicated and shall not grant relief based solely on the no-build area.

¶82 *3. Whether the District Court correctly awarded the Kultgens attorney fees and whether the Kultgens are entitled to attorney fees on appeal.*

¶83 Vicevich contends that the District Court lacked a legal basis to award the Kultgens attorney fees and costs under the 1977 Covenants and abused its discretion in awarding

38

them $106,209. Existence of authority for attorney fees is a question of law reviewed de novo for correctness; when legally authorized, the award amount is reviewed for an abuse of discretion. *Apecella*, ¶ 28; *Chase*, ¶¶ 14-15.

**The Covenants authorized an award of attorney fees**

¶84    Though the plaintiffs admitted in pleadings that the Covenants "cover Plaintiffs' and Defendants' properties," Vicevich contests their enforceability and the Kultgens' entitlement to fees.  Vicevich argues that decades of HOA inactivity and selective nonenforcement made the Covenants unavailable to authorize attorney fees and costs to the prevailing party.  The argument fails under the Covenant's individual-enforcement language and anti-waiver clause.  Section 8 prohibits fences and other obstructions on road easements.  Section 12 authorizes an owner of covered property to enforce the Covenants, mandates reasonable attorney fees to the prevailing party in enforcement litigation, and provides that prior nonenforcement does not waive later enforcement.  The HOA's activity therefore does not control the fee-authority inquiry.  The Kultgens, not the HOA, enforced an individual contractual right.  The anti-waiver clause forecloses the argument that other owners' failure to enforce other alleged violations extinguished that right.[23]

¶85    Finally, the limited modification of the remedial order does not alter the Kultgens' prevailing-party status in the District Court because they obtained the net benefit on the principal controversy:  recognition and preservation of the Lot 4 easement and relief from

---

[23] Vicevich also argues that § 70-17-210(3)(a), MCA (2025), while not retroactive, provides legislative guidance in these "types of cases."  We decline to apply an inapplicable statute.

the identified fence obstruction. *Kenyon-Noble Lumber Co. v. Dependant Founds., Inc.*, 2018 MT 308, ¶¶ 24-25, 393 Mont. 518, 432 P.3d 133.

¶86 "A court must award attorney fees if a contract provides for their recovery." *Lewis and Clark Cnty. v. Wirth*, 2022 MT 105, ¶ 40, 409 Mont. 1, 510 P.3d 1206. "The rights created by restrictive covenants are contractual rights." *McKay v. Wilderness Dev., LLC*, 2009 MT 410, ¶ 57, 353 Mont. 471, 221 P.3d 1184. Here, the Covenants expressly authorize an award of attorney fees and costs to the party prevailing in enforcement litigation. The District Court correctly concluded that the Covenants authorized reasonable attorney fees and costs to the Kultgens.

**The $106,209 award was reasonable and not an abuse of discretion**

¶87 If attorney fees are recoverable by statute or contract, an award must be reasonable. *Ferdig Oil Co., Inc. v. ROC Gathering, LLP*, 2018 MT 307, ¶¶ 23-24, 393 Mont. 500, 432 P.3d 118. The party seeking fees bears the burden of proving reasonableness of the hours billed and the resulting request. *Tafelski v. Johnson*, 2024 MT 143, ¶ 22, 417 Mont. 160, 552 P.3d 40; *Tacke v. Energy West, Inc.*, 2010 MT 39, ¶¶ 32, 34, 355 Mont. 243, 227 P.3d 601. When assessing reasonableness of fees, courts should consider "(1) the amount and character of the services rendered; (2) the labor, time and trouble involved; (3) the character and importance of the litigation in which the services were rendered; (4) the amount of money or the value of the property to be affected; (5) the professional skill and experience called for; (6) the attorneys' character and standing in their profession; and (7) the results secured by the services of the attorneys." *Plath*, ¶ 36 (the guidelines are not exclusive and courts may consider other factors). The court's fee determination must

be based on competent evidence. *Ferdig Oil*, ¶ 24. "[W]e will not substitute our judgment for the district court's judgment unless it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason resulting in substantial injustice." *Ferdig Oil*, ¶¶ 29-30; *Shephard v. Widhalm*, 2012 MT 276, ¶¶ 35-38, 367 Mont. 166, 290 P.3d 712. This is because "the district court is in the best position to determine an appropriate attorney fee award." *Ferdig Oil*, ¶ 29.

¶88 Here, the District Court held an evidentiary hearing; reviewed the Kultgens' counsel's affidavit, accounting, and unrefuted testimony; heard the Kultgens' expert's cross-examined testimony and Ed Mihelich's unrefuted testimony; applied the *Plath* factors; and reduced duplicative or unsupported entries by $2,758.50. It found 414.1 compensable hours at an adjusted average hourly rate of $256.48. The court also denied the requested mediator and Special Master costs. These findings reflect a conscientious review rather than automatic acceptance of the request.

¶89 The absence of a competing expert did not shift the Kultgens' burden; the Kultgens met their burden through affirmative evidence. The District Court could consider the unrebutted expert opinion together with the billing records, counsel's testimony, and its own familiarity with the litigation. Vicevich withdrew the expert-disclosure objection after receiving time to confer with the witness.

¶90 The District Court also addressed the principal line-item objections. It found that prelitigation work related to the fence dispute was used in the answer and counterclaim, while excluding duplicate post-complaint work. Montana law does not categorically prohibit block billing, and the court found the narratives sufficiently detailed.

41

*Kruer v. Three Creeks Ranch of Wyoming, L.L.C.*, 2008 MT 315, ¶¶ 43, 46, 346 Mont. 66, 194 P.3d 634. The court found that work concerning the separate dispute with the Miheliches protected the Kultgens' position in this case. It also correctly rejected a categorical bar on fees incurred after settlement negotiations failed. The fact that the court awarded approximately 98 percent of the requested fees does not, by itself, establish an abuse of discretion.

¶91 The District Court's award of $106,209 in attorney fees to the Kultgens was supported by competent evidence, reasonable under the circumstances, and within the District Court's discretion. The Covenant's fee provision applies "in the event of litigation" and entitles the prevailing party to reasonable attorney fees. It therefore encompasses fees reasonably incurred in appellate review of this enforcement action. *Transaction Network, Inc. v. Wellington Technologies, Inc.*, 2000 MT 223, ¶¶ 37-39, 301 Mont. 212, 7 P.3d 409; *Kenyon-Noble*, ¶ 28.[24]

¶92 The Kultgens remain the prevailing parties on appeal because they obtained the net benefit on the principal issues: the easement's existence, non-extinguishment, and the identified western-fence obstruction. Our reversal of the District Court's generic "any obstructions" provision and remand for clarified judgment consistent with the Rule 56 litigation and this Opinion is not a win for Vicevich that prevents the Kultgens from being the prevailing parties—they prevailed on all issues, including that they hold an express

---

[24] The Covenants do not, however, encompass the Kultgens' appellate request that this Court order reimbursement for the Kultgens' fees in an unrelated and possibly still-unresolved September 2025 lawsuit that was initiated months after the District Court's June 2025 final orders on summary judgment and attorney fees.

easement that was not extinguished and that the affected identified obstructing fence must be removed. Their unsuccessful defense of the broader unidentified "any obstruction" provision affects the reasonable amount of appellate fees, not entitlement. A prevailing party is not automatically entitled to every fee incurred, and a reasonable award may exclude time devoted to an unsuccessful, severable issue. *Kenyon-Noble*, ¶¶ 26-28; *DiMarzio v. Crazy Mt. Construction, Inc.*, 2010 MT 231, ¶¶ 53-54, 358 Mont. 119, 243 P.3d 718. We therefore award the Kultgens reasonable attorney fees incurred on appeal in an amount to be determined on remand.

## CONCLUSION

¶93 We affirm the judgment that the Lot 4 deed and Plat 222-B created an express 60-foot-wide ingress-and-egress easement benefitting the Kultgens and that Plat 727-B preserved that right; that the 2021 Easement Agreement did not modify, replace, relocate, or extinguish the Kultgens' easement; and that the Rule 56 evidence could not support extinguishment by abandonment by clear and convincing evidence. We express no opinion on the validity of or effect among the signatories to the 2021 Easement Agreement.

¶94 We affirm summary judgment that the specifically identified western fence obstructs the easement and must be removed. We reverse the generic provision requiring removal of unidentified obstructions placed within the easement less than five years before the action and remand for entry of an amended judgment precisely identifying the affected fence and requiring its removal in accordance with this Opinion. We direct that the amended judgment should clarify that no other fence, structure, or alleged obstruction has been adjudicated.

¶95     Finally, we affirm the District Court's award of $106,209 in attorney fees and costs. We also award the Kultgens reasonable attorney fees incurred on appeal and remand for the District Court to determine the amount consistent with this Opinion.

/S/ KATHERINE M. BIDEGARAY

We Concur:

/S/ CORY J. SWANSON
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ JIM RICE